**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Ashon LEFTENANT, Defendant–
Appellant.**

No. 02–4731.

United States Court of Appeals,
Fourth Circuit.

Argued: June 4, 2003.

Decided: Aug. 21, 2003.

**ARGUED:** Paul Geoffrey Gill, Assistant Federal Public Defender, Richmond, Virginia, for Appellant. Sara Elizabeth Flannery, Assistant United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Richmond, Virginia, for Appellee.

Before WIDENER, WILKINSON, and KING, Circuit Judges.

Affirmed in part and vacated in part by published opinion. Judge King wrote the opinion, in which Judge Widener and Judge Wilkinson joined.

## OPINION

KING, Circuit Judge:

On May 29, 2002, Ashon Leftenant was convicted of six counts of possessing counterfeit obligations of the United States, in violation of 18 U.S.C. § 472. On appeal, he has raised several issues. First, he asserts that his indictment should have been dismissed because of a violation of the Speedy Trial Act. Second, he contends that the district court erred in admitting evidence of uncharged counterfeiting activity. Third, he insists that the evidence against him was insufficient to sustain his convictions. Finally, he maintains that the charges in the indictment were multiplicitous. As explained below, we reject his first three contentions. However, as the Government now concedes, Leftenant was erroneously convicted of six offenses when the evidence established only a single act of possession. Thus, we vacate all save one of Leftenant's convictions.

### I.

### A.

On October 13, 2001, police officers responded to a call from Loyce Bailey, the manager of a Hardee's restaurant on Temple Avenue in Colonial Heights, Virginia. Bailey reported that a black male wearing an Atlanta Falcons hat had attempted to pass a counterfeit twenty-dollar bill. After the bill reacted to a counterfeit detection pen used by one of the restaurant's employees, Bailey advised Freeman that Hardee's would not accept it. Freeman then took the bill and left the restaurant, but he remained in the Hardee's parking lot with some friends.

Three police officers responded separately to Bailey's call, arriving at the Hardee's within minutes of one another. The first to arrive, Officer Richard Wilson, approached a group of individuals who were standing in the Hardee's parking lot. The second to arrive, Officer Steve Hanson, went inside the restaurant and spoke to Bailey, who verified that the counterfeit bill had been returned to the suspect, and that it had a black "X" on it from the counterfeit detection pen.

By this point, a third police officer, Detective Steve Kolev, had arrived on the scene, and he had joined Officer Wilson in questioning individuals in the parking lot. William Freeman, an African–American male, was one of the individuals in the parking lot, and he was wearing an Atlanta Falcons hat. Because Freeman matched the description of the person who had attempted to use the counterfeit bill, Officer Wilson separated him from the group and patted him down for weapons. During the patdown search, Wilson discovered a roll of money in one of Freeman's pockets, including fifteen counterfeit bills. None of these bills, however, bore the incriminating black "X."

Officer Wilson arrested Freeman for possession of counterfeit bills and transported him to police headquarters. During the trip, Freeman advised Wilson that, after Bailey advised him that the bill he had tendered was counterfeit, he had ripped it up. Wilson promptly radioed that information to the officers at the Hardee's. Officer Hanson and Detective Kolev then searched the area surrounding the Hardee's restaurant for the remnants of the bill, but they did not find anything.

After their search, Detective Kolev ran record checks on the remaining individuals in the parking lot, and he discovered that one of them, Derrick Ward, was the sub-

ject of an outstanding arrest warrant in Pennsylvania. Kolev arrested Ward and placed him in a police cruiser. Ward advised the officers that he had driven to the Hardee's in his girlfriend's Range Rover, and that he did not want anyone else driving the vehicle, which remained parked in the Hardee's lot. The restaurant manager, Loyce Bailey, in turn, advised the officers that he wanted the Range Rover removed from the premises.

At some point, the officers asked Leftenant if he had the keys to the Range Rover, and Leftenant reached into his right-hand pocket to search for them. As Leftenant removed his hand from his pocket, a twenty-dollar bill fell to the ground. It was folded such that a black "X" was clearly visible. On seeing the twenty-dollar bill fall from his pocket, Leftenant appeared shocked. Officer Hanson promptly retrieved the bill and placed Leftenant under arrest. When the officers searched Leftenant incident to the arrest, they discovered ten additional counterfeit bills. Five of these counterfeits were twenty-dollar bills, and the other five were fifty-dollar bills.

### B.

On November 13, 2001, criminal complaints were filed against Leftenant and Freeman in the Eastern District of Virginia, charging them with possession of counterfeit obligations of the United States, in violation of 18 U.S.C. § 470. On November 26, 2001, Leftenant and Freeman were arrested in connection with this charge. Two days later, on November 28th, the Government sought to amend the complaints to clarify that they intend-

ed to charge a violation of 18 U.S.C. § 472, rather than § 470, because § 470 applies only to acts committed outside the United States. After a detention hearing on November 28, 2001, and a bond reconsideration hearing conducted six days later, Leftenant was released on a personal recognizance bond on December 4, 2001.[1]

Thereafter, on December 28, 2001, the Government gave Leftenant and Freeman the opportunity to plead guilty to a misdemeanor charge. On that date, the Government filed a criminal information in the district court, charging Leftenant and Freeman with a misdemeanor offense, namely, possession of paper similar in size and shape to lawful currency with the intent to use it fraudulently, in violation of 18 U.S.C. § 491(b). On January 17, 2002, Leftenant and Freeman were arraigned on this misdemeanor charge, and trial was scheduled for March 7, 2002. On January 22, 2002, Freeman pled guilty to the misdemeanor, and he was later sentenced to three years of probation.

After a breakdown in plea negotiations with Leftenant, however, the Government discontinued its effort to prosecute him on the misdemeanor charge, and it instead presented the grand jury with an indictment charging felony possession of counterfeit bills. In particular, the indictment charged Leftenant with violating 18 U.S.C. § 472. Because Leftenant possessed groups of bills with six separate and distinct serial numbers, the indictment charged six counts of felony possession. The grand jury returned the indictment on March 5, 2002, and a jury trial was scheduled for May 29, 2002.[2]

---

**1.** From December 4, 2001, until May of 2002, Leftenant remained free on bond. On May 29, 2002, however, after he was convicted of the § 472 offenses, his bond was revoked.

**2.** The Speedy Trial Act requires a trial to "commence within seventy days from the filing date (and making public) of the information or indictment." 18 U.S.C. § 3161(c)(1).

On March 15, 2002, Leftenant moved to dismiss the indictment, maintaining that it was filed more than thirty days after his arrest on November 26, 2001, a delay he asserted violated the Speedy Trial Act (the "STA"). *See* 18 U.S.C. § 3161(b). Leftenant also asserted that the six counts in the indictment were multiplicitous. The court denied the motion from the bench on May 8, 2002, *United States v. Leftenant*, Transcript of Motion Hearing, No. 3:02CR078, at 7–10 (E.D.Va. May 8, 2002), and it entered a corresponding order the following day, *United States v. Leftenant*, Order, No. 3:02CR078 (E.D.Va. May 9, 2002). Without addressing the multiplicity issue, the court concluded that the STA had not been violated, reasoning that: (1) the filing of the § 491(b) information satisfied the STA's requirements, and although the information had been filed late, Leftenant had waived any right to object to its timeliness; and (2) the STA was not, in any event, implicated by the filing of the indictment on March 5, 2002, because it charged a different offense than the criminal complaint.

On May 28, 2002, the day before his trial, Leftenant filed a motion *in limine*, asserting that the Government should not be permitted to introduce into evidence certain Secret Service records (the "Secret Service records"), which documented counterfeiting activity for the same serial numbers in the Virginia area before and after his arrest. Prior to trial, the court denied the motion. *United States v. Leftenant*, Transcript of Motion Hearing, No. 3:02CR078, at 5 (E.D.Va. May 29, 2002).

Following a one-day jury trial, conducted on May 29, 2002, Leftenant was convicted of all six counts. Thereafter, pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure, he filed a motion for judgment of acquittal and a motion for a new trial. In support thereof, he contended that the evidence was insufficient to support his convictions; that the court should have dismissed the indictment pursuant to the STA; that the Secret Service records should not have been admitted against him; and that the six counts of the indictment were multiplicitous. After hearing argument on July 7, 2002, the court denied the motions. *United States v. Leftenant*, Transcript of Motion Hearing, No. 3:02CR78, at 8–11 (E.D.Va. July 7, 2002).[3]

On August 28, 2002, the district court sentenced Leftenant to six concurrent prison terms of twelve months each and to six concurrent terms of three years of supervised release. The court also imposed a $100 special assessment for each count. Leftenant has filed a timely appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's interpretation of the STA, while we review any of the court's related factual findings for clear error. *United States v. Stoudenmire*, 74 F.3d 60, 63 (4th Cir.1996). Second, we review a district court's evidentiary rulings for abuse of discretion. *United States v. Godwin*, 272 F.3d 659, 670 (4th Cir.2001), *cert. denied*, 535 U.S. 1069, 122 S.Ct. 1942, 152 L.Ed.2d 846 (2002). Third, in assessing a challenge to the sufficiency of evidence, we must uphold a guilty verdict if, viewing the evidence in the light most favorable to the Government, there is substantial evidence to support it. *Glasser*

Leftenant has not raised any issue with respect to this seventy day rule.

3. After ruling from the bench on July 7, 2002, the court entered a summary order denying both motions. United States v. Leftenant, Order No. 3:02CR78 (E.D. Va. July 10, 2002).

*v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *see also United States v. Myers*, 280 F.3d 407, 415 (4th Cir.), *cert. denied*, 537 U.S. 852, 123 S.Ct. 53, 154 L.Ed.2d 84 (2002). Finally, we review de novo a claim that charges in an indictment are multiplicitous. *United States v. Stewart*, 256 F.3d 231, 247 (4th Cir.), *cert. denied*, 534 U.S. 1049, 122 S.Ct. 633, 151 L.Ed.2d 553 (2001).

## III.

### A.

Leftenant first contends that the district court was obliged to dismiss the indictment because it was returned more than thirty days after his arrest, a delay that he maintains contravened the speedy indictment provision of the STA, 18 U.S.C. § 3161(b). The Government disagrees, contending that the filing of the information within the thirty day period of 18 U.S.C. § 3161(b) satisfied the STA's speedy indictment requirement. As explained below, the prosecution of Leftenant did not contravene the STA, but our resolution of this issue is premised on grounds other than those suggested by the Government.

### 1.

■ The STA requires that a defendant be indicted within thirty days of arrest. *See* 18 U.S.C. § 3161(b); *United States ·v. Williams*, 314 F.3d 552, 556 (11th Cir. 2002) (per curiam). Specifically, § 3161(b) provides that: "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested ·or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). Importantly, the STA does not limit the Government's ability to charge a defendant with offenses unrelated to the charge underlying his arrest. To the contrary, "[a]n unrelated charge can be brought at any time." *United States v. Heldt*, 745 F.2d 1275, ·1279 n. 9 (9th Cir.1984); *see also United States v. Mosquera*, 95 F.3d 1012, 1015 (11th Cir.1996) (per curiam) ("[T]he Speedy Trial Act does not guarantee that an arrested individual indicted within thirty days of his arrest must, in that thirty-day period, be· indicted for every crime known to the government, failing which he may never be charged." (alteration in original and internal quotation marks omitted)).

■ We must first assess whether the criminal complaint filed against Leftenant charged a violation of § 472, or a violation of § 470. This is our threshold inquiry because Leftenant's arrest on November 26, 2001, triggered the running of the STA's thirty-day speedy indictment clock only as to the offense for which he was arrested. *United States v. Giwa*, 831 F.2d 538, 541 (5th Cir.1987) ("[I]f the Government fails to indict a defendant within thirty days of arrest, the Act requires *dismissal of only the offense or offenses charged in the original complaint.*" (emphasis in original)). The district court decided that Leftenant was arrested for violating § 470, and that his arrest triggered the running of the STA clock as to this offense only. Thus, according to the court, the indictment could not be untimely under the STA because it charged violations of § 472, not § 470.

■ On this point, however, we disagree with the district court and deem Leftenant's arrest of November 26, 2001, to have been for a violation of § 472, rather than § 470. Although the complaint referenced § 470, its language indicates that the Government was, in substance, charging a violation of § 472. Further, the Government represented to the magistrate judge at

Leftenant's detention hearing that its intent had been to charge a violation of § 472, and it sought to amend the complaint accordingly. In these circumstances, the Government had thirty days—running from November 27, 2001, the day after Leftenant's arrest—in which to secure an indictment charging Leftenant with a violation of § 472. *See Stoudenmire*, 74 F.3d at 63 (observing that STA clock runs from date after triggering event); *see also United States v. Perez*, 217 F.3d 323, 328 n. 23 (5th Cir.2000) (overlooking "technical error in transcription" in construing charge alleged in indictment).

### 2.

The indictment, however, was returned on March 5, 2002, more than ninety calendar days after Leftenant's arrest. Even so, the indictment was not necessarily returned outside the STA's thirty day arrest-to-indictment period: § 3161(b) does not require that an indictment be returned within thirty *calendar* days of arrest. Instead, it requires that an indictment, in order to be considered timely, be returned within thirty *nonexcludable* days. In this regard, the STA provides a list of periods that are to be excluded in calculating the time within which an information or indictment must be secured. *See* 18 U.S.C. § 3161(h)(1)-(9). Among the excludable periods are: any period of delay resulting from other proceedings concerning the defendant, *id.* § 3161(h)(1); any period of delay resulting from the unavailability of the defendant or an essential witness, *id.* § 3161(h)(3); any period of delay resulting from the defendant's mental incompetence, *id.* § 3161(h)(4); and some periods of delay resulting from trial continuances, *id.* § 3161(h)(8). Thus, we must next determine which, if any, of the days between Leftenant's arrest on November 26, 2001, and his indictment on March 5, 2002, are

subject to exclusion from the thirty-day period of § 3161(b).

■ As explained below, sixty-nine days of this period must be excluded because of delay from "other proceedings" involving the defendant. As noted, § 3161(h)(1) renders excludable "any period of delay resulting from other proceedings concerning the defendant." 18 U.S.C. § 3161(h)(1). This "other proceedings" provision requires that we first exclude the dates on which pretrial hearings were conducted. *See United States v. Wright*, 990 F.2d 147, 148 (4th Cir.1993) (holding that dates of pretrial hearings must be excluded from speedy indictment calculation). In Leftenant's case, the trial court spent two such days on pretrial hearings—November 28, 2001 (detention hearing), and December 4, 2001 (bond reconsideration hearing). The exclusion of these two days extended the thirty-day period of § 3161(b) from December 26, 2001 (thirty days after November 27, 2001) until December 28, 2001 (the day when the Government filed the information).

Next, we must assess whether the sixty-seven days between December 28, 2001 (when the information was filed) and March 5, 2002 (when the indictment was returned) are excludable under the STA. And, as explained below, we conclude that they are. Put simply, the § 491(b) proceedings constitute "other proceedings" within the meaning of § 3161(h)(1), and the delay resulting therefrom tolled the thirty-day clock on the § 472 charges. After the filing of the § 491(b) information on the last possible day allowable under the STA, the parties engaged in plea negotiations on the § 491(b) charges. While Leftenant's codefendant, Freeman, accepted the Government's plea offer, Leftenant refused to plead guilty to the § 491(b) offense. After the negotiations

broke down, the Government sought and obtained an indictment charging Leftenant with violations of § 472. In these circumstances, the § 491(b) proceedings constitute "other proceedings," within the meaning of § 3161(h)(1). Indeed, the STA defines "other proceedings" to include any "delay resulting from trial with respect to other charges against the defendant." 18 U.S.C. § 3161(h)(1)(D). In this situation, the sixty-seven day period devoted to the § 491(b) charges—from the filing of the information on December 28, 2001, until the indictment on March 5, 2002—must be excluded in calculating § 3161(b)'s thirty-day time limit.

In nearly identical circumstances, the Ninth Circuit, in *United States v. Arellano-Rivera*, 244 F.3d 1119 (9th Cir.2001), *cert. denied*, 535 U.S. 976 (2002), held that the filing of a criminal information tolled the thirty-day period of § 3161(b). In that case, the Government filed an information charging the defendant with an offense (a violation of 8 U.S.C. § 1325) different from the offense involved in his arrest and subsequent indictment (a violation of 8 U.S.C. § 1326). *Id.* at 1120. After a break down in plea negotiations on the § 1325 charge, the Government obtained an indictment charging Arellano-Rivera with a violation of § 1326. *Id.* The court concluded that the indictment had been filed within § 3161(b)'s thirty-day time limit because the plea negotiations on the § 1325 charge were "other proceedings" within the meaning of § 3161(h)(1). *Id.* at 1123–24; *see also United States v. Lopez–Osuna*, 242 F.3d 1191, 1197–98 (9th Cir.2000) (holding that plea negotiations constitute "other proceedings"); *United*

*States v. Bowers*, 834 F.2d 607, 610 (6th Cir.1987) ("[T]he plea bargaining process can qualify as one of many 'other proceedings.'"); *United States v. Montoya*, 827 F.2d 143, 150 (7th Cir.1987) (same).

In sum, Leftenant was arrested on November 26, 2001, for violating § 472, and the STA's thirty-day clock began to run the next day. *Arellano–Rivera*, 244 F.3d at 1123; *see also Stoudenmire*, 74 F.3d at 63. Thus, absent excludable periods of delay, the STA required that Leftenant be indicted by December 26, 2001. The two days spent on pretrial hearings extended the thirty-day period to December 28, 2001, and the sixty-seven days devoted to the § 491(b) proceedings further extended the applicable period until March 5, 2002, when Leftenant was indicted. Thus, the indictment *was* filed in a timely manner, and the STA did not mandate its dismissal.

### B.

Leftenant next maintains that the district court abused its discretion in permitting introduction of the Secret Service records. Leftenant asserts that, because he was not charged with any of the counterfeiting activity documented in the Secret Service records, they were irrelevant to his prosecution and thus inadmissible under Rule 401 of the Federal Rules of Evidence.[4] In the alternative, Leftenant asserts that, even if the Secret Service records were relevant, they should nevertheless have been excluded, pursuant to Rule 403, because they were unduly prejudicial.[5] We reject each of these contentions.

---

**4.** Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In general, rel-

evant evidence is admissible, and irrelevant evidence is inadmissible. Fed.R.Evid. 402.

**5.** Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of un-

### 1.

As we have often observed, relevance typically presents a low barrier to admissibility. *United States v. Van Metre,* 150 F.3d 339, 349 (4th Cir.1998). Indeed, to be admissible, evidence need only be "worth consideration by the jury," or have a "plus value." *United States v. Queen,* 132 F.3d 991, 998 (4th Cir.1997) (internal quotation marks omitted). In light of this threshold, the district court was within its discretion in concluding that the Secret Service records were relevant to Leftenant's prosecution. The records served to establish that some of the notes confiscated from Leftenant were of sufficient quality to be considered "counterfeit" currency within the meaning of § 472. *Cf. United States v. Ross,* 844 F.2d 187, 189 (4th Cir.1988) (stating that, for conviction under § 472, fake notes must have "similitude" to real currency before they can be considered "counterfeit"); *United States v. Smith,* 318 F.2d 94, 94–95 (4th Cir.1963) (same).

In this instance, the Secret Service records documented the passing of counterfeit bills bearing identical serial numbers to those confiscated from Leftenant. Because serial numbers on real currency are unique to each note, *see United States v. Rahm,* 993 F.2d 1405, 1409 (9th Cir.1993), the fact that the serial numbers on Leftenant's counterfeit notes were identical to those on the bills referred to in the Secret Service records makes it reasonable to conclude that these notes were from the same source and were of similar stock and quality. In such circumstances, the Secret Service records tended to establish that Leftenant possessed counterfeit bills of such quality that they could be mistaken for real currency and that the bills were

thus "counterfeit" within the meaning of § 472. Accordingly, the district court was within its discretion in deciding that the Secret Service records were relevant to Leftenant's prosecution.

### 2.

The district court was also within its discretion in its Rule 403 assessment. On this point, Leftenant correctly points out that the Secret Service records indicate that notes with serial numbers identical to those confiscated from him were widely circulated prior to his arrest, but that the circulation of such notes decreased dramatically thereafter. Because of the incriminating inference the jury could have drawn from the decrease in counterfeiting activity after Leftenant's arrest, Leftenant contends that the Secret Service records impermissibly left the jury with the impression that he must have been involved in such counterfeiting activity.

The Government stipulated at trial, however, that Leftenant was not involved in the specific counterfeiting activity detailed in the Secret Service records. Moreover, the records might actually have assisted Leftenant's defense: a juror could just as easily have concluded that the Government's failure to implicate Leftenant in any of the counterfeiting activity documented in the Secret Service records made it less likely that Leftenant had committed the offenses with which he was charged. In these circumstances, the trial court did not abuse its discretion in its Rule 403 assessment, and the Secret Service records were properly admitted into evidence.

### C.

Leftenant also maintains that the evidence was insufficient to support his con-

---

fair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403.

victions. In particular, he asserts that there was no evidence either that he knew the bills found in his possession to be counterfeit, or that he intended to use these bills to defraud. Both knowledge and intent are necessary elements of a § 472 conviction. The Government counters that the evidence was sufficient to support the verdict and that the court correctly denied Leftenant's motion for judgment of acquittal. In denying this motion, the district court reasoned that, viewing the evidence in the light most favorable to the prosecution, the jury was entitled to find Leftenant guilty as charged.

In order to establish that Leftenant had violated § 472, the Government was required to prove three elements: (1) that Leftenant possessed counterfeit money; (2) that, at the time of such possession, he knew the money to be counterfeit; and (3) that he possessed the counterfeit money with the intent to defraud. *United States v. Acosta*, 972 F.2d 86, 89 (5th Cir. 1992). Because the counterfeit bills were in Leftenant's possession, there was no dispute as to the first element. Instead, the issues for the jury were whether Leftenant knew that the notes were counterfeit, and whether he possessed those notes with the intent to defraud.

After weighing the evidence presented at trial, a reasonable juror could readily have concluded that the last two elements were satisfied. First, the Government presented the testimony of Officer Hanson, who advised the jury of Leftenant's behavior when the first counterfeit bill fell from his pocket. According to Hanson, when Leftenant saw the bill fall from his pocket, "he had a shocked look on his face." Viewed in the proper light, Leftenant's reaction indicated that he realized that he had been caught with counterfeit currency and that he had intended to use it to defraud. Second, the Government discredited Leftenant's explanation of how he came into possession of the counterfeit bills. Leftenant claimed to have obtained the bills, which appeared new and unhandled when they were seized by police, while gambling in a fast-paced dice game. By Leftenant's own admission, however, the money used in the dice game changed hands quickly and repeatedly, making it unlikely that any bills obtained from such a game would appear new and unhandled. In weighing this evidence, the jury could well have concluded that Leftenant was lying in his explanation of how the bills came into his possession. In these circumstances, the jury was entitled to find that Leftenant knew that he possessed counterfeit bills and that he intended to use them to defraud.

### D.

Finally, Leftenant contends that the six separate counts charged in the indictment were multiplicitous. In particular, he maintains that he should not have been charged with multiple counts of § 472 possession when he was found in possession of counterfeit currency at a single time and in a single location. The indictment charged a separate count for each of the six serial numbers on the eleven counterfeit bills found in Leftenant's possession. The Government now concedes that its charging decision was erroneous and that the six charges in the indictment are multiplicitous. In short, it acknowledges that Leftenant should have been charged with a single count of § 472 possession, and that we should vacate all of Leftenant's convictions save one.

In similar circumstances, we have held that a defendant cannot be convicted of multiple counts of possession when multi-

ple items of contraband are seized on a single occasion. *See United States v. Bennafield*, 287 F.3d 320, 323–24 (4th Cir. 2002), *cert. denied*, 537 U.S. 961, 123 S.Ct. 388, 154 L.Ed.2d 315 (2002) (holding that defendant could only be convicted of single act of possession for simultaneous possession of multiple packages of cocaine); *United States v. Dunford*, 148 F.3d 385, 389–90 (4th Cir.1998) (holding that defendant could only be convicted of single act of possession where multiple firearms were seized at single time and location). Similar to the situations presented in *Bennafield* and *Dunford*, we have a situation here in which Leftenant was charged and convicted of multiple offenses when the evidence established only a single act of possession. Under such circumstances, "the appropriate remedy is to vacate all of [the convictions] but one." *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993). Accordingly, we vacate all of Leftenant's convictions—and their related sentences and special assessments—except one.

### IV.

For the foregoing reasons, we affirm one of Leftenant's convictions, one of the twelve month prison terms, and one of the $100 special assessments. We vacate Leftenant's other five convictions, five of the six concurrent terms of twelve months imprisonment, and five of the six $100 special assessments.

*AFFIRMED IN PART AND VACATED IN PART.*