**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4263**

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

MARCO ANTRIONE CHERRY, JR., a/k/a Marco Antrione Cherry,

                    Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Robert G. Doumar, Senior District Judge. (2:11-cr-00071-RGD-FBS-1)

Argued: May 17, 2013                    Decided: June 13, 2013

Before WILKINSON, DUNCAN, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson and Judge Wynn joined.

**ARGUED:** Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Sherrie Scott Capotosto, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia; Richard J. Colgan, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

DUNCAN, Circuit Judge:

Marco Cherry appeals his conviction of various firearm and drug crimes, arguing that the Speedy Trial Act required that his indictment be dismissed as untimely and that the district judge plainly erred in revealing details of his criminal history before the jury was polled. We determine that the Speedy Trial Act precludes dismissal of an untimely indictment when a defendant fails to move for dismissal prior to trial. Next, we find that although the district judge's comments to the jury were erroneous, they did not rise to the level of plain error. Accordingly, we affirm Cherry's convictions.

I.

1.

On March 9, 2010, Norfolk Police Officers Alex Keeling and Frank Been saw a black Hummer fail to stop at a stop sign. They attempted to initiate a traffic stop, activating their lights and siren and using their loudspeaker to instruct the driver of the vehicle to pull over. The driver failed to stop, and the officers gave chase. While in pursuit, Officer Keeling saw a cigar-shaped object, which he later determined was a marijuana cigar, being tossed out of the window.

After driving for several blocks, the driver pulled the vehicle over. The police identified the driver as Lamont

2

Jordan; Cherry was the passenger. The officers approached the vehicle and smelled marijuana through its open windows. Officer Been took Jordan several feet away from the vehicle to speak with him. The officers decided to search the vehicle, and Officer Keeling ordered Cherry to step out of the car. Cherry became "very aggressive" and attempted to push Officer Keeling. J.A. 215. A struggle ensued, during which a metal object, which Officer Keeling thought to be a firearm, hit the ground. Cherry then attempted to flee. Officer Keeling tackled Cherry to the ground, and Officer Been, responding to Officer Keeling's call for backup, threatened to use a Taser on Cherry. When Officer Been activated the Taser, it automatically recorded a video of the encounter. Cherry stopped struggling and the officers took him into custody.

Once they had handcuffed Cherry and allowed him to stand up, the officers recovered from the ground two small bags containing pills, twenty of which turned out to be 3,4-Methylenedioxymethamphetamine hydrochloride (commonly known as ecstacy), and nine of which turned out to be a different controlled substance, a stimulant called N-Benzylpiperazine. The Taser video shows the bags of pills lying on the ground as Cherry stood up, and recorded Officer Been exclaiming that there was "E [ecstasy] all over the place." J.A. 270. Other police officers arrived at the scene, one of whom, Officer Eric Ortiz,

3

recovered a Glock nine-millimeter pistol from the ground in front of the Hummer on the passenger side, where Officer Keeling had first struggled with Cherry.

2.

On July 12, 2010, Cherry was charged in a federal criminal complaint with possession with intent to distribute ecstasy in violation of 21 U.S.C. § 841(a)(1), possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c), and possession of a firearm after a felony conviction in violation of 18 U.S.C. § 922(g). An arrest warrant was issued along with the complaint, and the warrant was filed as a detainer at the Chesapeake city jail, where Cherry was serving a Virginia state sentence.

On Friday, April 1, 2011, the Chesapeake jail authorities notified Cherry that he was being "released" to a federal detainer, and notified the U.S. Marshals Service that he had completed his state sentence. On Monday, April 4, 2011, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives transported Cherry from the Chesapeake jail to the U.S. District Court in Norfolk. That day, the court held Cherry's initial appearance and issued an order of temporary detention. On Wednesday, April 6, 2011, the court held a detention hearing and ordered that Cherry be detained pending further proceedings. On May 4, 2011, a grand jury issued an

4

indictment charging Cherry with the crimes set forth in the complaint.[1]  The district court set the case for trial on June 30, 2011.

Prior to trial, Cherry's court-appointed attorney filed a motion to withdraw.  The court granted the motion and appointed another attorney.  Cherry subsequently filed a motion to suppress, which the court denied.  He also filed a motion to continue his trial, which the court granted.  Cherry filed no motions related to the timeliness of his indictment under the Speedy Trial Act.  The court ultimately held the trial on September 20-21, 2011.

At trial, the Norfolk police officers testified as to the circumstances surrounding Cherry's arrest, the events preceding and succeeding it, and the evidence they had recovered from the scene.  Cherry also testified: he stated that the object that fell from him during the struggle was a chain necklace, not a gun, and that the gun and tablets the police had recovered were not his.  He also testified that he was not aware that smoking marijuana was illegal--testimony which was subsequently impeached when the government elicited testimony from him that

---

[1] A grand jury later returned a superseding indictment that differed from the original indictment only in that it changed the chemical description of ecstasy--replacing the term "methylenedioxyamphetamine" with "methylenedioxymethamphetamine."

he had a recent previous arrest for marijuana possession. As to other aspects of Cherry's criminal history, the parties stipulated that he had been convicted of a felony.

The trial lasted for two days. The jury deliberated during the afternoon of the second day and returned a verdict before the end of the day. During deliberations, the jury sent two notes to the court. First, they asked to see the video recorded by the Taser again, which they reviewed twice. Second, they asked the court, "Was there anybody else that was standing by the vehicle or on site before Officer Ortiz arrived?" J.A. 511. The court told the jury to consider the evidence that had been presented to them, and allowed them to have Officer Ortiz's testimony read back to them.

When the jury had finished deliberating, the jury foreperson handed the verdict form, which she had signed, to the clerk, who passed it to the district judge. The judge returned the guilty verdict to the clerk, who proceeded to read it aloud. The clerk then asked, "Members of the jury, is this your verdict, so say you all?" J.A. 514. All the members of the jury indicated an affirmative response. At this point, the judge thanked the jury and added the following remarks:

> Sometimes all of the information is not given to you. This defendant had previously been convicted of distributing a controlled substance, had previously been convicted of resisting arrest, and had previously

been convicted of carrying a firearm in furtherance of a drug trafficking crime.

I only tell you that to tell you that these things are not admissible because of the way the rules are written, that a person has to be judged on this particular crime, but I just thought I would tell you about that because it tells you a little bit about Mr. Cherry's background and it will give you some idea of that.

I thank you for your paying close attention, just so you would know what, unfortunately, I know because I can see all of this information, and you haven't seen it and it would not be admissible. But the rules of evidence under these circumstances didn't permit it.

J.A. 514-15. Immediately following these comments, it became clear that the defense counsel wished to poll the jury. The clerk asked each juror, in succession, "Is this your verdict?" Id. at 515-16. And each juror replied that it was. Id.

## II.

Cherry argues that we should reverse the verdict for two reasons. First, he contends that the district court should have dismissed the indictment as untimely under the Speedy Trial Act, notwithstanding his failure to move for its dismissal prior to trial. Second, he argues that the district judge's comments to the jury revealing his criminal history before the jury could be polled constituted plain error. We address each of these arguments in turn.

7

A.

The Speedy Trial Act requires that a defendant be indicted within thirty days of arrest and tried within seventy days from the later of the filing of the information or indictment or the defendant's initial appearance before a judicial officer. 18 U.S.C. § 3161(b), (c)(1); United States v. Leftenant, 341 F.3d 338, 343 (4th Cir. 2003). The district court's interpretation of the Speedy Trial Act is a question of law, which we review de novo. Leftenant, 341 F.3d at 342.

The "Sanctions" section of the Speedy Trial Act, 18 U.S.C. § 3162, lays out in subsection (a) the consequences for failing to timely indict or bring to trial a defendant:

> (1) If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped. . . .
>
> (2) If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof of supporting such motion but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h) (3). . . . Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.

18 U.S.C. § 3162(a) (emphasis added).

Cherry argues that because the waiver clause is included only in § 3162(a)(2)--the speedy trial provision of the "Sanctions" section--and not § 3162(a)(1)--the speedy indictment provision--there is no requirement that a motion under the speedy indictment provision of the Act be filed before trial. Indeed, he contends that the speedy indictment provision does not even require the defendant to file a motion at all. Cherry cites the principle that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," Russello v. United States, 464 U.S. 16, 23 (1983) (alterations and citation omitted), arguing that had Congress intended the speedy indictment right to be waived upon failure to move for dismissal before trial, it would have included the waiver language not only in § 3162(a)(2), but also in § 3162(a)(1).

This argument rests on, as the government puts it, a contention "that 'section' does not mean section.'" Appellee's Br. at 15. Although creative, this argument cannot change the plain language of the statute.[2] The waiver clause applies to

---

[2] The implausibility of Appellant's interpretation was further illustrated at oral argument; even Cherry's appellate counsel referred to 18 U.S.C. § 3162(a)(1) and (2) as
(Continued)

9

"this section"--i.e., Section 3162, which governs both the speedy trial right and the speedy indictment right. Despite Cherry's attempt to argue otherwise, § 3162(a)(2) is only a paragraph of a subsection of the Speedy Trial Act, and not its own "section." Its waiver provision--that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section"--thus refers not only to that paragraph, but to all of § 3162.

The terminology used throughout the U.S. Code bears out this intuitive reading. The terms "section," "subsection," and "paragraph" are used consistently, and "section" always refers to the subdivision smaller than a chapter and larger than a subsection. See U.S. Senate, The United States Code, http://www.senate.gov/pagelayout/legislative/one_item_and_teasers/usCode_page.htm (last visited May 30, 2013) ("The U.S. Code is organized by subject area into 50 titles. Titles are further broken down by chapter and section. Citations to the U.S. Code look like this: 42 U.S.C. 1382 or 42 § 1382. This means the law appears in title 42, section 1382 of the Code.").

---

"subsections." Oral Argument at 3:45, available at http://www.ca4.uscourts.gov/OAaudiotop.htm.

Moreover, all other circuits to have addressed this question have determined that a defendant who does not file a speedy indictment motion before trial waives his right to raise that issue.  See United States v. Spagnuolo, 469 F.3d 39, 41 (1st Cir. 2006); United States v. Gamboa, 439 F.3d 796, 804 (8th Cir. 2006); United States v. Lewis, 980 F.2d 555, 560 (9th Cir. 1992), abrogated on other grounds by Bloate v. United States, 559 U.S. 196 (2010).

We join our sister circuits in interpreting the plain language of § 3162(a)(2) to mean that a defendant who fails to move for dismissal prior to trial on the basis of an untimely indictment waives his right to move for dismissal under the speedy indictment provision of the Speedy Trial Act.[3]

B.

Next, Cherry argues that the district court erred by revealing his criminal history before the jury could be polled. Federal Rule of Criminal Procedure 31(d) provides that "[a]fter a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually."  If the poll reveals that the verdict was

---

[3] Cherry and the government also disagree about whether Cherry was indicted within thirty days of his arrest, as calculated under the Speedy Trial Act.  Because we hold that he waived any right to move for dismissal by failing to raise the issue before trial, we do not reach this question.

11

not unanimous, the court may direct the jury to deliberate further or declare a mistrial. Rule 31(d) "establishes an absolute right to have the jury polled." United States v. Edwards, 469 F.2d 1362, 1366 (5th Cir. 1972).

Because Cherry did not object after the court revealed his criminal history, we review the court's action for plain error. Under the plain error standard, a defendant must demonstrate "(1) that an error occurred, (2) that the error was plain, and (3) that it affected his substantial rights." United States v. Penniegraft, 641 F.3d 566, 575 (4th Cir. 2011). If the defendant establishes those threshold requirements, we may exercise our discretion to correct the error "when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. (quoting United States v. Olano, 507 U.S. 725, 736 (1993)) (alteration omitted).

### 1.

It is fundamental that "[n]otwithstanding the broad discretion accorded trial judges," a judge "must maintain such a demeanor that 'every one shall recognize that what is said from the bench is the cool and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of the advocate.'" United States v. Godwin, 272

12

F.3d 659, 676-77 (4th Cir. 2001) (quoting <u>Wallace v. United States</u>, 281 F.2d 656, 665 (4th Cir. 1960)).  For this reason, the "privilege of the judge to comment on the facts has its inherent limitations."  <u>Quercia v. United States</u>, 289 U.S. 466, 470 (1933).  These limitations apply even after a jury has returned a verdict, for a verdict is not final until it has been recorded, after the parties have had adequate time to request a poll.  <u>See</u> <u>Government of the Virgin Islands v. Hercules</u>, 875 F.2d 414, 419 (3d Cir. 1989) ("'[A] verdict is not final when announced.'  Rather, 'the test for validity of the verdict is whether it 'was certain, unqualified and unambiguous considering the circumstances of the receipt of the verdict and poll of the jurors relative to their verdict.'") (alteration and citations omitted).

The purpose of a jury poll "is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned," to ensure that "a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented."  <u>United States v. Carter</u>, 772 F.2d 66, 68 (4th Cir. 1985) (quoting <u>Miranda v. United States</u>, 255 F.2d 9, 17 (1st Cir. 1958)).  To inject remarks that might influence jurors' decisions before they may be polled individually is thus improper.  It is error for a judge to

13

remark on the culpability of the defendant, the merits of the case, or the correctness of the verdict before a party has the opportunity to request a poll. See United States v. Harlow, 444 F.3d 1255, 1267 (10th Cir. 2006) (recognizing that "intervening comments by a judge can undermine the defendant's right to poll the jury"); United States v. Randle, 966 F.2d 1209, 1213 (7th Cir. 1992) (finding reversible error where, after receiving the verdict from the jury, the judge proceeded to read the probation officer's memorandum, which detailed the defendant's criminal history).

By commenting on inadmissible aspects of the defendant's criminal history before allowing defense counsel a reasonable amount of time in which to request a poll of the jury, the court erred. And because all district judges are no doubt aware of their duty to "take special care to maintain an appearance of impartiality," Anderson v. Warden, Md. Penitentiary, 696 F.2d 296, 299 (4th Cir. 1982), the court's error was plain.

2.

Even where a district court plainly errs, we will not overturn a verdict unless that error affected the defendant's substantial rights, which generally means that the "error must have been prejudicial." Olano, 507 U.S. at 734. The defendant has the burden of showing that the error "'affected the outcome of the trial,' or 'probably influenced the verdicts' against

14

him." United States v. Rolle, 204 F.3d 133, 139 (4th Cir. 2000) (quoting Olano, 507 U.S. at 734-35) (alterations omitted). "Where the evidence is overwhelming and a perfect trial would reach the same result, a substantial right is not affected." Godwin, 272 F.3d at 680 (citation omitted). Cherry is unable to shoulder this burden: the evidence against him was overwhelming and the circumstances surrounding the erroneous remarks are strong indicia that the jury had reached a unanimous guilty verdict.

Both Officer Keeling and Officer Been gave detailed testimony concerning Cherry's activities at the time of his arrest and the items recovered afterward. In particular, Officer Keeling testified as to his struggle with Cherry next to the Hummer, and stated that he heard the sound of a metal object falling to the ground, which, based on his experience as a police officer, he thought was a gun. He also testified that, after he tackled Cherry to the ground, placed him in handcuffs, and stood him up, he and his partner "were able to recover two bags of suspected narcotics" from that site. J.A. 223. As Officer Keeling put it, "as soon as we picked him up we saw [the bags] sitting right there," "[l]iterally, within three feet" of where he had tackled Cherry to the ground. Id. at 244. This testimony was corroborated by Officer Been's testimony, as well as by the recording made by Officer Been's Taser. Of particular

15

significance, in the video, after the altercation between Cherry and Officer Keeling, Officer Been can be heard saying, "Damn, E all over the place"--in other words, that "[t]here's ecstasy on the ground and it's a large quantity of it."  Id. at 270.  Officer Ortiz also testified.  He stated that he arrived at the scene while Officer Keeling was with Cherry on the ground, and that he recovered a small semiautomatic handgun from the ground, five to ten feet from the Hummer.  He further stated that he did not see any jewelry or anything else in the vicinity.  The only opposing evidence was Cherry's own testimony, which was impeached and uncorroborated.

Mitigating any potential damage done by the court's ill-advised comments was the fact that the jury was already aware that Cherry was a convicted felon.  Although the jurors had not been told what crimes Cherry had been convicted of, the parties stipulated that he had been "convicted in a court in Virginia of a qualifying felony crime punishable by imprisonment for a term exceeding one year prior to the occurrence of the acts charged as violations in the indictment."  Id. at 360.  Furthermore, during the trial, the members of the jury also became aware that Cherry had previously been arrested for possession of marijuana, as the government elicited testimony from Cherry as to that fact in order to impeach his statement that he was not aware that smoking marijuana was illegal.  Id. at 401.

16

Cherry makes much of the fact that the jury twice interrupted their deliberations to ask questions of the court. The jury requested to see the Taser video recording again, and asked whether there was anybody else standing by the vehicle before Officer Ortiz, who recovered the gun, arrived at the scene. Such requests are not uncommon, and we do not find them to be evidence of a lack of unanimity among the jurors as to their ultimate findings. Moreover, despite Cherry's attempts to cast the deliberations as long--and by implication, contentious--the jury returned its verdict on the same afternoon it retired.

The fact that the jury foreperson presented the court with a signed verdict form before the judge's erroneous recitation of Cherry's criminal history further indicates the unlikelihood that his statements affected the trial's outcome. The clerk read the verdict aloud and asked, "Members of the jury, is this your verdict, so say you all?" J.A. 514. In response to this question, the jurors all indicated an affirmative response. While a collective affirmation is not a substitute for a poll, we find in this instance that it constitutes further evidence of the unanimity of the jury and indicates the irrelevance of the judge's comments to the outcome of the trial. See United States v. Miller, 59 F.3d 417, 421 (3d Cir. 1995) ("When [a collective poll] is considered against the backdrop of a relatively simple case, a short period of deliberation by the jury, and no

17

indication in the record that any of the jurors displayed reluctance or disagreement with the verdict, we cannot say that the district court abused its discretion."); Carter, 772 F.2d at 67-68.

We further note that the judge's comments in this case are distinguishable from those in the two cases from our sister circuits that Cherry relies on, Harlow, 444 F.3d 1255, and Randle, 966 F.2d 1209. The judicial comments to the jury in both of those cases were considerably more egregious than those at issue here. In Harlow, the judge relayed a personal conversation he had with a government witness which revealed that 168 children had been implicated in the use of methamphetamine provided by the conspiracy involving the defendant and the terrible impact of methamphetamine on communities. 444 F.3d at 1260. He went on to commend the jurors on rendering a public service on par with several highly publicized cases. Id. In Randle, the judge read out the probation report, which stated in part, "there is no combination or conditions that can assure that this defendant will not continue to get into trouble with the law. His track record speaks for itself." 966 F.2d at 1213. The judge's comments here were less inflammatory, although we acknowledge that they could have been understood as implying the accuracy of the jury's verdict. See Harlow, 444 F.3d at 1268 (quoting Quercia,

18

289 U.S. at 470 ("The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling.")).  Moreover, in Randle, the only case of these two to result in a reversal, the judge denied defense counsel's request to conduct an individual poll outright.  966 F.2d at 1213.  Here, in contrast, the court allowed for a poll as soon as it became clear that defense counsel desired that one be conducted.

Given these circumstances, it is difficult to imagine that a different outcome might have resulted had the court not erred.  Accordingly, we find that the error did not affect Cherry's substantial rights and does not warrant reversal.

III.

For the foregoing reasons, each of Cherry's convictions is

AFFIRMED.