**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Louis D. RANDLE, Defendant–Appellant.**

**No. 91–1462.**

United States Court of Appeals, Seventh Circuit.

Argued May 26, 1992.

Decided July 15, 1992.

---

Barry R. Elden, Asst. U.S. Atty., Mark S. Hersh (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Daniel G. Martin, Federal Public Defender, Office of the Federal Public Defender, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

When defendant Louis D. Randle answered the door to 7622 North Eastlake, Apartment 2A, Chicago, at approximately 3:00 p.m. on February 13, 1990, he had no reason to suspect that the person who appeared before him was anything other than who he represented himself to be, an Airborne Express delivery man. Indeed, Randle told the man he had been expecting a delivery for some time. The delivery man, however, was Detective George Mays, a Chicago Police Officer assigned to the Drug Enforcement Administration (DEA) Task Force. Mays told defendant he had a package for Andre Brown. Randle said he was Brown. Mays said he would have to sign for the package, and handed him the Airborne Express cartage record. As Randle began to print the name Andre Brown, Mays saw that he did so with difficulty, so he asked Randle again if he was Brown. This time, Randle admitted he was not Brown, but said he had been talking to him on the telephone when Mays arrived. Mays then asked Randle to sign his own name after Brown's so that he would know to whom he delivered the package. Randle complied, and Mays handed over the package.

The package first came to the attention of law enforcement authorities at its point of origin, Los Angeles, California. The Airborne Express employees who accepted the package for delivery to Andre Brown in Chicago became suspicious its contents might be dangerous. When they opened it up, they discovered a white-taped package resembling a brick of cocaine. They notified the Los Angeles Police Department, who performed a field test on the contents

of the package. The test results showed the package contained cocaine.[1] The Los Angeles Police took custody of the package and contacted the Chicago DEA Task Force. The two agencies arranged to have the package, its contents intact, delivered to DEA agents in Chicago. When it arrived, DEA agents removed all but an ounce of cocaine, replacing the remainder with a similarly appearing substance before resealing it. Agents then made arrangements with Airborne Express for Mays to deliver the package, driving one of their trucks and wearing one of their uniforms.

After he made the delivery to Randle, Mays left the apartment, drove the delivery truck approximately two blocks away, changed from the Airborne Express uniform to his own clothes, and joined members of the Task Force team who then placed the apartment building under surveillance. Shortly, the team observed Randle leave the apartment building walking a dog. He made a brief stop at a nearby store, then walked the dog back to the apartment. Although Randle did not appear to have been carrying anything when he left the apartment, the agents feared he may have made a full or partial delivery of the cocaine during his visit to the store. For that reason, about fifteen minutes after Randle returned, Mays and another Task Force agent, Jerry Robinson, knocked on the apartment's back door. When Randle answered, Robinson asked him if Andre Brown was home. Randle said he was not. The agents then identified themselves as police officers and asked Randle if they could come inside and talk to him about Brown. Randle opened the door and admitted the two agents.

Once inside, Robinson asked Randle when he expected Brown to return. Randle responded that he didn't know. Robinson then asked about the package Airborne Express had just delivered, but Randle said he had not received a package. The agents then revealed to him that they had observed the Airborne Express delivery. In response, Randle said Brown had been there but just left with the package. This prompted Robinson to radio the surveillance team outside the apartment building, and Mays to check with the officers standing in the hallway. Both men determined that none of the team observed anyone leave the apartment after the delivery, except Randle when he walked to the store. At that point, agents advised Randle of his constitutional rights, and then asked for permission to search the apartment for the package. Randle verbally consented.

Within minutes, one of the agents found the unopened package in the back of the dining room closet, hidden from view under a pile of clothing and boxes. Agents then advised Randle of his rights a second time, and placed him under arrest. In response to the agents questions about Andre Brown and who sent the package from California, Randle pointed to some nearby photographs. He said the persons in the photos were from California, and the agents would want to talk to them. He gave no further information, however, except to say that he would "take the fall" for the narcotics and would not inform on anyone else. With that, some of the agents left with Randle in custody. Mays and a few others remained behind to secure the apartment. While they were there, two men appeared at the apartment. Mays asked them for identification, which they produced. One of them displayed a California identification card.

The Special May 1987 Grand Jury returned a three-count indictment against Randle on March 13, 1990. Count one charged Randle with conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Count two charged him with possessing with intent to distribute approximately 1011 grams of a mixture containing cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count three charged Randle with knowingly and intentionally making a false statement in a matter within the jurisdiction of the DEA, in violation

1. A later laboratory analysis showed the package contained approximately one kilogram of 93 per cent pure cocaine. Testimony at trial established the cocaine's value to be approximately $400,000.

**1212**

of 18 U.S.C. § 1001. The matter was heard by a jury, which convicted Randle on counts one and three. On February 22, 1991, the district court sentenced him to 92 months imprisonment, to be followed by three years of supervised release.

Randle filed a timely notice of appeal. He argues that the district court erred: (1) in failing to grant an evidentiary hearing on his motion to suppress evidence, and (2) in denying his motion for a mistrial after having failed to allow a poll of the jury after the return of the verdict. We affirm the district court's evidentiary ruling, but reverse its denial of a mistrial.

## I.

■ Before trial, Randle moved to suppress the inculpatory statements he made to the agents before they advised him of his constitutional rights, claiming he was in custody at the time. The motion also sought suppression of the fruits of the search, claiming he had not given his consent to search. Randle requested an evidentiary hearing on the motion to suppress. After the district court had all memoranda and supporting affidavits before it, it denied the motion to suppress without a hearing. Randle asserts this was erroneous.

■ A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. *United States v. Rollins*, 862 F.2d 1282, 1291 (7th Cir.1988), *cert. denied*, 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). Reliance on vague, conclusory allegations is insufficient. A defendant must present "definite, specific, detailed, and nonconjectural" facts that justify relief before a district court will grant a suppression hearing. *United States v. Hamm*, 786 F.2d 804, 807 (7th Cir.1986). Additionally, these facts must be material, and they must be disputed. *United States v. Goudy*, 792 F.2d 664, 667 (7th Cir.1986).

Randle's affidavit in support of his motion to suppress states, in its entirety:

On the day the man deliver a package, I accept the package. The apartment belong to Chris and Mike. They married. And then two police come to the door. I thought they going to lock me up. Say "you have a package here." They tell me to sit at the table. The other polices come in. At least one more police. They start to look around. They don't ask me could they look around. They just looking. I am scared because I think something bad must be in the package. As soon as they come to the door I am scared.

Affidavit of Louis D. Randle, Record Document 38, Appendix B.

On the issue of whether Randle was in custody, noticeably absent from the affidavit are allegations that the agents used intimidation, force or threats of force, that they displayed weapons, or that they physically restrained Randle in any way whatsoever. Randle simply says "I thought they going to lock me up.... I am scared." These statements of what Randle subjectively believed are insufficient to sustain his burden. *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir.1990). They fail to establish that he was "subjected to restraints of freedom such that the conditions of formal arrest were closely approximated or actually attained." *Id. See also United States v. Hocking*, 860 F.2d 769, 772–73 (7th Cir.1988) (in-home questioning of 62–year old defendant with heart condition non-custodial even though it lasted for three hours and agents told him he faced imprisonment and forfeiture). As the district court correctly determined, Randle's allegations fail to meet *Hamm*'s requirement of being definite, specific, detailed, and nonconjectural.

■ The issue of whether the search violated Randle's constitutional rights is resolved by his own statement that "[t]he apartment belong to Chris and Mike." [2] "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by

2. At trial, the parties stipulated that on February 13, 1990, the lessee of Apartment 2A at 7622 North Eastlake Terrace, Chicago, was a person named Michael Sebastian. Trial Transcript at 193.

the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). Even assuming that Randle did not consent to the search, he fails to allege how the search of an apartment not leased to him violated *his* privacy rights. Or the search of a package of which he was neither the sender nor the addressee. *See United States v. Koenig*, 856 F.2d 843, 846 (1988). Again, Randle failed to meet his burden. The district court's denial of Randle's request for a hearing on his motion to suppress was not erroneous.

## II.

When the jury returned its verdict on November 16, 1990, the following occurred:

THE COURT: Has the jury reached a verdict?

Are you the foreperson of the jury?

THE FOREMAN: We have, your Honor.

THE COURT: What is your name?

THE FOREMAN: Sir?

THE COURT: What is your name?

THE FOREMAN: My name is Gordon J. Hepburn.

THE COURT: Okay, read the verdict into the record.

THE FOREMAN: The verdict is:

"We, the jury, find the Defendant Louis Dante Randle guilty as charged in Counts No. 1 and 3 of the indictment and not guilty as charged in Count No. 2."

THE COURT: Okay, may I have the verdict, please?

(Document tendered to the Court.)

Thank you.

The jury has reached a verdict of guilty on two counts of the indictment.

[*Lapse of approximately 1.5 seconds.*]

On November 14, 1990, the Court received a memorandum from the Probation Department stating, in part, as follows:

"In the twelve—in the past twelve months, the defendant has had six arrests, four after being released on bond on the instant offense. His total number of arrests is twenty-two. This officer"—

MR. MARTIN [defense counsel] [*approximately 12 seconds after the court began to read the memorandum aloud*]: Judge—

THE COURT: —"continues to feel that there is no combination or conditions that can assure that this defendant will not continue to get into trouble with the law. His track record speaks for itself."

Therefore, the probation officer recommends that the defendant's bond be revoked and that the subject be detained.

What is the Government's position?

MS. ANDERSON [the prosecutor]: Judge, do you want to address this in the presence of the jury?

MR. MARTIN: Judge, can we—

THE COURT: The jury has reached the verdict.

MR. MARTIN: Can we go to the side, Judge?

(The following proceedings were had at the side bar, out of the hearing of the jury:)

MR. MARTIN: Judge, with all respect, I—I was going to ask the Court to poll the jury, and your Honor started to read that—that bond order before I could get up and ask you.

THE COURT: The motion to poll is discretionary. This verdict is clear, no doubt about it. The motion to poll is denied.

Trial Transcript (Tr.) at 314–15 (indications of approximate times elapsed ours).

After the jury was discharged, and all counsel had an opportunity to listen to the tape recording of the return of the verdict, the judge reconvened in chambers, where defense counsel continued to press his point that he had no opportunity to request a poll. The judge stated, among other things, "there was at least a reasonable interval during which time you could simply have said, 'Move to poll,' or ask for a polling or something like that." Tr. 332.

■ Within the time allotted by the court for post-trial motions, Randle moved

for a mistrial based on the court's failure to allow a poll of the jury. In his order denying that motion, the judge stated, again among other things, "The defendant did not request a poll at the appropriate time and therefore there was no error in the failure to poll the jury." District Court's Order of February 12, 1991, at 11. The judge further stated that "defense counsel, through their delay and failure to properly present a motion to poll to the court, have waived defendant's right to poll the jury." *Id.* at 21–22 (footnote omitted).

 Randle argues that the district court's failure to allow his counsel an opportunity to request a poll of the jury, and denial of his motion for a mistrial, constitute reversible error requiring a retrial. We agree. We have said that the right to poll the jury, although not constitutional, is nonetheless a substantial right. *United States v. Shepherd,* 576 F.2d 719, 724 (7th Cir.1978), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1979). Our rules do not require a poll unless a party requests it, FED.R.CRIM.P. 31(d), but the parties must be afforded a reasonable amount of time within which to make the request. *Id.* at n. 3, citing *United States v. Marr,* 428 F.2d 614, 615 (7th Cir.1970).

We have listened to the tape recording of the return of the verdict, and by our clock, one and a half seconds lapsed between the time the judge confirmed the jury's verdict and began to read the probation officer's memorandum in the presence of the jury. The only audible sound on the tape during that second and a half is the rustle of papers, presumably from the judge setting down the verdict and picking up the probation officer's memorandum. Although the court may have thought that interval sufficient time to allow counsel to request a poll, even the fastest thinking attorney could not have anticipated that the judge had concluded his remarks and was waiting for a request to poll. As soon as defense counsel understood the nature of the document the court was reading, twelve seconds later, he attempted to gain the judge's attention. But by then, the damage was done—the jury had heard Randle's arrest record for the preceding twelve months.

 The interval in this case clearly was inadequate. We reiterate our statements in *Marr* and *Shepherd,* and require the district court, after the verdict has been read, to afford both counsel a reasonable opportunity to request a poll. Because what is a reasonable time is fact specific and defies precise parameters, the better practice is for the district court to inquire of both counsel if either has anything further before the jury is discharged, which, of course, invites the request to poll.

### III.

In sum, we AFFIRM the district court's denial of an evidentiary hearing on Randle's motion to suppress, but we REVERSE its denial of a mistrial. The matter is REMANDED for a new trial consistent with this opinion.