No. 2--06--0888      Filed:  6-2-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--346 |
| KEVIN W. WHEAT, | ) ) | Honorable Charles R. Hartman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial, defendant, Kevin W. Wheat, was convicted of possession with intent to deliver more than 100 but less than 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2002)).  He was sentenced to 16 years' imprisonment.  On appeal, defendant argues that:  (1) the trial court erred by denying his motion to quash a search warrant and suppress evidence; (2) the trial court erred by responding to a jury question asking for a definition of "reasonable doubt"; (3) the trial court erred by refusing defendant's request to poll the jury; and (4) he is entitled to a credit of $1,430 against his fines.  We affirm in part, reverse in part, and remand for a new trial.

I. BACKGROUND

The background material in section I is nonpublishable under Supreme Court Rule 23.

[**The following material is nonpublishable under Supreme Court Rule 23.**]

The following facts are derived from Don Powers' affidavit supporting his complaint requesting a warrant to search a house at 500 West Chestnut Street in Freeport. Powers was an inspector with the State Line Area Narcotics Team. On March 8, 2005, he observed an undercover officer give money to a man Powers knew as Jeremy Richards to purchase cocaine. Richards walked to 500 West Chestnut, entered and exited the house, and then delivered cocaine to the undercover officer.

Powers further averred that on October 25, 2005, he saw a garbage can with a lid in front of the residence, between the sidewalk and the street, in an area garbage would normally be placed for pick up. That day was the normal trash collection day for the neighborhood. The can had loose trash inside, and Powers "seized" the trash by removing it from the can and putting it inside a clean trash bag. He examined the contents at a "secure location" and found a Ziploc bag containing 52 grams of a green leafy substance that tested positive for cannabis. Powers also found a cell phone bill dated October 6, 2005, for a "Mathew [sic] A. Lawson" at 500 West Chestnut Street.

Based on the affidavit, the trial court issued a search warrant for 500 West Chestnut Street for cannabis, cannabis paraphernalia, other illegal substances, evidence of possession or ownership of the premises, and money found in close proximity to any cannabis or controlled substance.

Powers and other officers executed the search warrant on October 26, 2005. The officers recovered over 360 grams of cocaine, a digital scale, more than $9,000 in cash, and some documents with defendant's name. Defendant was present during the search and was taken into custody immediately afterward.

On November 10, 2005, defendant was charged by information with possession with intent to deliver more than 100 grams but less than 400 grams of cocaine. On November 17, 2005,

defendant moved to quash the search warrant and suppress evidence. Defendant argued that the search warrant was not supported by probable cause because there was an unreasonable delay between the criminal activity reported on March 8, 2005, and the issuance of the search warrant, and because there was an insufficient connection between items obtained from the trash and the residence.

The trial court held a hearing on the motion to quash the warrant and suppress evidence on January 23, 2006. Neither party presented any witnesses. After hearing argument, the trial court found as follows. That the trash can was in front of 500 West Chestnut was some evidence that it came from that address, but was not, on its own, enough of a connection to the residence to obtain a search warrant. However, the recent cell phone bill for 500 West Chestnut that was found in the trash provided sufficient additional evidence to create a reasonable inference that the can and its contents came from 500 West Chestnut. It was unlikely that an interloper would throw 52 grams of marijuana in the trash because people frequently buy smaller quantities than that for "real money," and an interloper could just throw away a few used "baggy corners" if he or she just wanted to frame defendant. It was also unbelievable that an interloper would have pilfered a bill from defendant's legitimate trash and thrown it in with the marijuana. It was more likely that someone in the house mistakenly threw the marijuana out. While the March 2005 drug purchase alone would not support getting a search warrant in October, the purchase provided corroboration and reinforcement of the trash evidence that there was drug activity in the house. Based on these findings, the trial court denied defendant's motion to quash the warrant and suppress evidence.

Defendant's trial took place on June 5 and 6, 2006. The following facts are derived from the testimony of six police officers who executed the search warrant, as well as from physical evidence.

The officers began surveillance on 500 West Chestnut Street between 7 and 8 a.m. on October 26, 2005. No one was seen entering or exiting the residence until shortly after 12:50 p.m., when defendant walked out of the house and started to get into the car parked on the driveway. Officers approached, and defendant identified himself. The officers read defendant the search warrant. Defendant said that he did not live at the house, but he produced a key at the officers' request.

The officers accompanied defendant back into the residence. Defendant was fidgety and nervous. The house contained a basement; a first floor with a dining room, living room, kitchen, and bathroom; and a second floor with two bedrooms and a bathroom. There was a sofa completely covered with clothes in the living room as well as a second sofa with clothes in the dining room. In the living room, the police found an "agreement for deed" that indicated that defendant had entered into a contract to buy the house in September 2004. The police also found a September/October 2005 gas bill and a June/July 2005 water and sewer bill, both with defendant's name and the 500 West Chestnut address.

Upstairs, one of the bedrooms contained a table and a couple of chairs, and it had clothes strewn about. In the second bedroom, a large, unmade bed almost filled the entire room. Underneath the bed's comforter the police found a digital scale and a bag with what was later determined to be 361.8 grams of cocaine.

An officer asked defendant if all the money the police found belonged to him, and defendant looked down and sighed. The police then began searching for money. In the upstairs bathroom, the police recovered a little over $9,000[1] wrapped in a sock underneath the vanity. The money was

---

[1]One officer testified that $9,010 was recovered while another officer testified that $9,130 was recovered.

folded in a manner that divided it into $1,000 increments. The entire search took about 45 minutes to one hour.

After the police arrested defendant, they seized an additional $208 from his wallet. An officer asked defendant about his employment. He said that he did odd jobs and worked for Elite Construction about 20 hours per week, and that he had previously worked for Modern Plating.

There was also evidence presented at trial that defendant's $1,101 annual premium for his car insurance policy was paid in full in cash, even though the policy was written for payments on a monthly basis. Another witness testified that on September 20, 2005, defendant bought a Mercury Sable for about $6,500 in cash.

The owner of Elite Construction, Chad Wirsing, testified that he had known defendant for about 10 years. Defendant had worked for him in the past, but it had been a couple of years. Defendant was not working for Wirsing in October 2005, though he still periodically inquired about extra work. When defendant did work for Wirsing, Wirsing paid him in cash.

Wirsing and defendant signed an "agreement deed" for defendant to buy 500 West Chestnut from Wirsing. The agreement was dated September 1, 2004, and called for a down payment of $3,000 and monthly payments of $400. Until October 2005, defendant was current in his payments.

Matt Lawson testified that he had been friends with defendant for three or four years. In June 2005, Lawson helped defendant get a cell phone in Lawson's name. Lawson filled out the paperwork but had the bills sent to 500 West Chestnut. At that time, Lawson was living in Ridott with his parents. Defendant paid about $300 or $400 to cover about six months of service.

An officer accepted as an expert in drug trafficking testified that cocaine is sold on the street for about $80 to $100 per gram. The quantity recovered from 500 West Chestnut would not be for

personal use; a serious user could use up to one ounce of cocaine at a time, and the quantity recovered was about 13 times that amount. The cocaine had a street value of $37,000. The proximity of the digital scale to the cocaine suggested that the scale was used to measure quantities of cocaine or other illegal drugs. The upstairs bathroom was about 10 feet away from the bedroom, and the proximity of the $9,000 to the scale and the cocaine indicated that the money may have been obtained from the sale of drugs. The lack of "baggie corners" or other drug paraphernalia did not preclude a conclusion that the home's occupant possessed the drugs with an intent to deliver.

Emma Rude testified for the defense as follows. She had known defendant for about four years and had become "pretty close friends" with him, but they did not have a dating relationship. In 2005, she had pled guilty to a felony charge of unlawful possession of cannabis. Rude had lived behind defendant's house until February 2005. While she was defendant's neighbor, she visited his house anywhere from one to seven days per week, and she went there just as frequently after she moved. When Rude visited during the period of February to October 2005, there were "quite a few people" who did not live there but "stayed over and stuff." She knew that they stayed there because she would either be the last one to leave and watch them pass out, or she would get there early in the morning and see them still sleeping. Rude personally knew people who stayed at 500 West Chestnut for more than one day at a time; there were two people in particular who stayed there frequently between September and October 2005, right before defendant got arrested. Defendant himself sometimes stayed overnight at a camper that one of their friends owned.

Rude had spent the night at defendant's house at times, including around October 2005, and on those occasions she saw defendant sleep downstairs on the living room couch. Even when she had not spent the night, she had come over some mornings and seen defendant sleeping in the living

room.  Rude had never seen defendant sleeping in the bedroom.  However, he did use the upstairs shower.

Rude agreed that she was not present on October 26, 2005, when the police searched the house.  However, she had been there within a few days before that.  She found out about the arrest two days after it occurred, but she did not go to the police and say that other people had been hanging out at the house.  A couple of months before trial, Rude had received a card asking her to contact the police, so she did.  Rude agreed that when an officer asked her about defendant, she said that she wanted to talk to her own attorney or defendant's attorney before talking to the officer.  Rude explained that she had gotten upset because the officer started asking her about her closed case, and she wanted to ask a lawyer about her rights and make sure that anything she said would not affect her probation.  At that time, Rude had briefly met with defendant's attorney but had not yet been asked to testify for the defense.

Rude had never seen defendant possess or deal cocaine when she was over.  She had occasionally seen people use cocaine at the house when there were get-togethers, but she had never seen defendant handling or using cocaine.  Rude agreed that defendant did not ask the people using cocaine to leave.

While the jury was deliberating, it sent the trial court a note stating:  "please define reasonable doubt.  Is reasonable doubt one hundred percent sure, or can it be less than one hundred percent sure on the evidence?  Please define reasonable doubt."  The trial court told the parties that it had an obligation to answer the question without defining reasonable doubt.  Over defendant's objection, the trial court then instructed the jurors that it could not define reasonable doubt for them; that it was "whatever you find it to be after searching your mind and your experiences in life and

discussing the case with your fellow jurors and after deliberating with your fellow jurors"; that the law did not assign a percentage to reasonable doubt, and that if "the law of Illinois was a hundred percent, [it] would have told [them] a hundred percent," and that if "the law of Illinois was one percent, [it] would have told [them] one percent," but in Illinois it was not a "percentage point of *** anything."

After the jury returned with a verdict, the trial court read the guilty verdict out loud and then discharged the jury. Defense counsel asked that the jury be polled. The trial court responded, "I've already discharged them. I looked at you and waited a moment, and you didn't ask for it." The trial court subsequently made some more concluding remarks to the jury.

Defendant filed a motion for a new trial on July 6, 2006, which included the first three contentions of error he now raises on appeal. The trial court denied the motion on August 7, 2006. It sentenced defendant to 16 years' imprisonment and ordered him to pay a $36,000 street value fine, a statutory fine of $3,000, a "discretionary fine" of $100,000, a $100 lab fee, and a $100 assessment fee. Defendant filed a motion to reconsider the sentence on August 31, 2006, and the trial court denied the motion on the same day. Defendant timely appealed.

[**The preceding material is nonpublishable under Supreme Court Rule 23.**]

II. ANALYSIS

A. Motion to Quash and Suppress

The material in section IIA is nonpublishable under Supreme Court Rule 23.

[**The following material is nonpublishable under Supreme Court Rule 23.**]

Defendant first argues that the trial court erred in denying his motion to quash the search warrant and suppress evidence. For a search warrant to be valid, the complaint and supporting

affidavit need to show probable cause that the warrant should be issued. People v. Smith, 372 Ill. App. 3d 179, 181 (2007). Probable cause "means simply that the totality of the facts and circumstances within the affiant's knowledge at the time 'was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched.' " People v. McCarty, 223 Ill. 2d 109, 153, (2006), quoting People v. Griffin, 178 Ill. 2d 65, 77 (1997). The judge issuing the warrant must make a practical, commonsense decision of whether, considering all the circumstances related in the affidavit, including the credibility and basis of knowledge of those supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in the place sought to be searched. McCarty, 223 Ill. 2d at 153.

Defendant argues that because he does not dispute any of the facts set forth in the affidavit but rather claims only that the facts stated were insufficient to establish probable cause, it presents a purely legal question, and we should review the trial court's ruling de novo. However, our review focuses on the determination of the judge issuing the warrant, rather than on the trial court's review of that judge's determination. Smith, 372 Ill. App. 3d at 181-82. We must not substitute our judgment for the magistrate's in construing an affidavit, but rather, we must decide whether the magistrate had a substantial basis for concluding that probable cause existed. McCarty, 223 Ill. 2d at 153.

Defendant notes that the central allegations of Powers' affidavit supporting his request for the search warrant were as follows: (1) on March 8, 2005, he saw an individual he knew as Jeremy Richards deliver cocaine to an undercover officer after entering and exiting 500 West Chestnut; and (2) on October 25, 2005, Powers searched "loose trash" in a garbage can outside of 500 West

Chestnut and found a plastic bag containing 52 grams of cannabis and a recent cell phone bill issued to someone other than defendant at that address.

Defendant argues that these allegations, even when considered together, fail to establish probable cause. First, defendant argues that the cocaine transaction in early March 2005 did not provide any basis for concluding that anyone inside 500 West Chestnut was connected to the delivery, because Powers had no way of knowing whether Richards possessed the cocaine before he entered the house or whether he still had the cash from the sale on him after exiting the house. Defendant further argues that the transaction was too stale to establish probable cause because whoever resided at 500 West Chestnut during that time would have had ample time to get rid of the contraband in the seven months before the issuance of the warrant, and there was no evidence that anyone associated with the residence was engaged in on-going illegal activity.

Second, defendant argues that the evidence in the trash was not sufficient to support probable cause because the garbage can contained loose trash, as opposed to tied bags, so anyone could have easily deposited the cannabis into the trash containing the cell phone bill after the can was taken to the curb. Defendant argues that no one saw who placed the can at the curb, or when it was placed there, and the can may have been accessible to the public for several hours. Finally, defendant points out that the trial court rejected the possibility that someone not associated with 500 West Chestnut Street deposited the cannabis after the trash can had been hauled to the curb because, under the trial court's reasoning, the person could have deposited a small quantity of cannabis to frame defendant, rather than 52 grams of it. The trial court stated that someone in the house probably threw it away accidently. Defendant argues that the inference that someone inside 500 West Chestnut accidentally threw out the cannabis is completely at odds with the refusal to infer that somebody outside the

residence had done exactly the same thing, whether by mistake, because the person did not want to dispose of the cannabis in his or her own trash, or because a passerby saw the bag lying outside and disposed of it in the nearest trash can without even realizing what it was.

In support of his arguments about the evidence found in the trash, defendant cites People v. Burmeister, 313 Ill. App. 3d 152 (2000). In Burmeister, the police sought a warrant to search the defendants' house based on anonymous tips and searches of plastic garbage bags in front of the residence on three consecutive trash days, which revealed small plastic bags and other items that tested positive for cocaine. Burmeister, 313 Ill. App. 3d at 153-54. In conjunction with their motion to quash their arrests and suppress evidence, the defendants submitted affidavits stating that they always used a large blue bin for trash because black trash bags were prohibited by trash collection rules, and they submitted photographs of their home, neighboring homes, and the trash bin they used. Burmeister, 313 Ill. App. 3d at 154. The trial court granted the defendants' motion, and this court affirmed. Burmeister, 313 Ill. App. 3d at 159. We stated that while the police could search curbside trash without a warrant, the police may not presume that evidence that they discover in the trash came from the nearest residence because anyone can rummage through such trash and deposit incriminating items. Burmeister, 313 Ill. App. 3d at 155. We further stated that the anonymous tips cited in the complaint for the warrant application were lacking in detail and unreliable. Burmeister, 313 Ill. App. 3d at 157-58. We therefore held that "when an application for a search warrant is based on contraband discovered in curbside trash, probable cause exists to search the home only if the application includes a reliable eyewitness account of the defendant depositing the trash." Burmeister, 313 Ill. App. 3d at 159. In arriving at this conclusion, we distinguished an out-of-state

case where "indices of residency" were found in the defendant's trash, because no such indices were described in the warrant application at issue. Burmeister, 313 Ill. App. 3d at 157.

The subject of "indices of residency" in trash was revisited a couple of years later in People v. Balsley, 329 Ill. App. 3d 184 (2002). There, the affidavit supporting the complaint for a search warrant stated that the police collected a garbage bag from a garbage can on the side of the street. The can was near the mailbox of a dwelling on a day that garbage in the area was usually collected. The police found tiny pieces of cannabis and two pieces of mail from utility companies addressed to the defendant. Balsley, 329 Ill. App. 3d at 185. This court upheld the issuance of the search warrant, concluding that because the garbage bag contained "indices of residency" linking the trash to the defendant's residence, it was not necessary for a reliable eyewitness to have seen the defendant deposit the trash in order for there to be probable cause to search the defendant's home. Balsley, 329 Ill. App. 3d at 188. We further stated that the concerns expressed by the Burmeister court about tampering were not at issue in Balsley because the trash bag was tied tightly shut and there was no evidence of tampering. Balsley, 329 Ill. App. 3d at 188. We held that the facts supporting a finding of probable cause included the garbage's location in relation to the residence's location, the nature of the residential area, the quantity of cannabis, the identifiers in the trash bag, and the trash bag's condition and manner in which it was secured. Balsley, 329 Ill. App. 3d at 188.

A similar result was reached in People v. Stage, 337 Ill. App. 3d 242 (2003). In that case, the officer's affidavit said that the defendant, his son, and a woman named Carol Bower were all living at a particular address. The officer collected a tightly-sealed garbage bag from the garbage can in front of the residence. In it, he found objects that tested positive for cocaine and methamphetamine. Stage, 337 Ill. App. 3d at 243. The officer also found an advertisement sent to

the home's address and an envelope addressed to Bower at that address. Stage, 337 Ill. App. 3d at 244. Relying on Balsley, the appellate court held that because there were indicia that connected the garbage containing contraband to the residence to be searched, probable cause existed for the search warrant to be issued. Stage, 337 Ill. App. 3d at 244-45.

Defendant argues that the instant case is distinguishable from Balsley and Stage because although there was an "indicia of residency" in that a recent cell phone bill issued to someone at 500 West Chestnut Street was found in the trash along with the contraband, the garbage bag contained loose trash unlike the tightly closed trash bags in Balsley and Stage. Defendant maintains that, therefore, the concerns in Burmeister regarding the possibility of tampering also exist here. Defendant also argues that whereas the evidence in Balsley indicated that the next nearest residence was 100 yards from the residence where the trash had been placed at the curb, no such evidence was presented here.

We conclude that the judge issuing the warrant had a substantial basis for concluding that probable cause existed, in that Powers' affidavit alleged sufficient facts to allow the judge to make a practical, commonsense decision that there was a fair chance that contraband would be found in 500 West Chestnut. Powers filed the complaint for a warrant on October 25, 2005, the same day that he searched the trash. The search warrant was also issued on the same day, and the police executed it on the following day. Though Powers did not mention in his affidavit exactly how far from the house the trash can was placed, he did state that the can was in front of the residence, between the sidewalk and the street, in an area garbage would normally be placed for collection, and that it was the trash collection day for the area. Unlike Burmeister, there was a recent cell phone bill addressed to 500 West Chestnut Street, which provided a direct indicia of residency connecting the trash to that

address. We agree with defendant that the fact that the trash was loose rather than in tied bags is a factor that was not present in Balsley and Stage. However, unlike those two cases, here there was additional evidence that the police had seen a drug dealer enter and exit the residence during a drug buy earlier that year. While we also agree with defendant that evidence connecting the drug buy to the house was somewhat remote in time and did not directly show that drugs had come from the house, we conclude that it provided sufficient corroboration of the evidence found in the trash to support a finding of probable cause. For these reasons, the trial court did not err by denying defendant's motion to quash the warrant and suppress evidence.

[**The preceding material is nonpublishable under Supreme Court Rule 23.**]

### B. Polling the Jury

We address defendant's argument that the trial court erred by refusing his request to poll the jury, as we find this issue dispositive of the remainder of the case. Defendant argues that the record shows that the trial court gave him no more than two seconds to ask for the jury to be polled before discharging the jury and that he ultimately made the request to poll while the jury was still present.

We summarize the facts surrounding defendant's request to poll in some detail, as they are particularly relevant in determining whether the request was timely and whether defendant was otherwise given the opportunity to request a poll. When the jury returned after deliberations, the trial court read the verdict and noted that the jurors had signed the pertinent verdict form and left the other two verdict forms unsigned. Within two seconds, the trial court then addressed the jury as follows:

> "[THE COURT:] All right. Thank you, ladies and gentlemen of the jury. You are now discharged from your duties and responsibilities.
>
> You can now write the book or not write the book. It's up to you.

[DEFENSE COUNSEL:] Judge--

THE COURT: You can dis--discuss with the defense attorney anything that you choose or not discuss with the defense attorney. Sometimes the lawyers have questions. Feel free to answer them. Feel free not to answer them.

The State's Attorney stepped out for a few moments, and I wasn't gonna keep you in there 'cause I'm not sure how long *** before he comes back, so I thought you have done your job and I'm discharging you, as I say, from your duties."

The trial court then told the jurors that, if they were wondering what would happen next, there would typically be posttrial motions in which the defense attorney would point out any errors that occurred. If the trial court denied the motions, it would proceed to sentencing, which the trial court described to the jury in general terms. The trial court next stated, "So that's the process. It will continue on for some time to come." There was a pause of about four seconds, after which defense counsel stated, "Your Honor, we would make a motion [that] the Jury be polled." The trial court replied, "I've already discharged them. I looked at you and waited a moment, and you didn't ask for it. So they've been discharged."

The trial court then told the jury, in remarks that the record shows lasted about 54 seconds:

"As you--as you walk out of the courtroom[,] *** if you walk by those monuments out there, the people that paid for the seats we're in, I think you can walk by with a sense of pride knowing that you discharged your responsibilities. You gave the Defendant an opportunity for a fair trial, I think a very fair trial. You did what you were supposed to do. And as I say, you can walk by knowing that you didn't let those people down, that they did not die in vain, they died to make sure that people would have an opportunity, among other

things, freedom of region [sic], freedom of speech, but certainly freedom to have a jury trial

and to make the government prove that which it accuses us of.

Thank you very much for your service. Have a good day."

During the hearing on defendant's motion for a new trial, in discussing the request to poll,

the trial court stated that the verdict had been returned and it had discharged the jury. Defense

counsel responded that, after "the jury read the instruction [sic]," "the court looked at [him] for a

second or two" and then discharged the jury. Defense counsel further stated that he asked to poll the

jury in the middle of the trial court's instruction, but the trial court informed him that the jury had

already been discharged, and it did not poll the jury. The trial court replied that it had never seen a

jury flip on a polling issue, though a flip could theoretically happen. It "looked, [it] didn't hear a

request for a polling, [it] spoke, [and] discharged the jury." The trial court stated that it considered

asking the jurors to sit back down and go through the polling process, but decided that, since it had

dismissed them, they could "go on their way." The trial court denied defendant's motion for a new

trial.

The opportunity to poll jurors is basic to our legal system, which requires unanimity among

the jurors. People v. Rehberger, 73 Ill. App. 3d 964, 968 (1979). "The purpose of the poll of a jury

is to determine whether the verdict has in fact been freely reached and remains unanimous." People

v. Ellis, 93 Ill. App. 3d 981, 985 (1981); see also People v. Kliner, 185 Ill. 2d 81, 166 (1998).

Through a jury poll, jurors may freely assent or dissent to the verdict without the fear, errors, or

coercive influences that may have prevailed in the jury's private collective deliberations. People v.

Banks, 344 Ill. App. 3d 590, 597 (2003). In Illinois, after a guilty verdict is returned but before it

is accepted and recorded, a criminal defendant has an absolute right to poll the jury regarding

whether each individual agreed with the pronounced verdict. Rehberger, 73 Ill. App. 3d at 968-69. This right has been described as a "substantial" right (People v. Herron, 30 Ill. App. 3d 788, 791 (1975)), and, if the jury is not polled despite a defendant's timely request to do so, reversible error occurs (People v. DeStefano, 64 Ill. App. 2d 389, 408-09 (1965)). Moreover, if a defendant is denied the opportunity to poll the jury, his conviction must be reversed. See Rehberger, 73 Ill. App. 3d at 969 (where jury's verdicts were not pronounced in open court and the defendant did not have a chance to poll the jury before the trial court accepted the verdicts, the defendant's convictions were reversed); see also People v. Townsend, 5 Ill. App. 3d 924, 926 (1972) (appellate court ordered a new trial where the record showed that sealed verdict was received without agreement of the defense and was opened outside of the defendant's presence, and where the jury was not present and could not be polled when the defendant was advised of the verdict). Still, a defendant is required to have only an opportunity to poll the jury, so the right to poll may be waived. See People v. Hood, 262 Ill. App. 3d 171, 178 (1994).

Our research has not revealed any cases that directly discuss the applicable standard of review for the polling issues raised by defendant. We note that polling the jury on nonverdict-related issues, such as the potentially prejudicial effect of newspaper articles, is within the trial court's discretion. People v. Black, 314 Ill. App. 3d 276, 280 (2000). The manner in which jury polls are conducted is also within the trial court's discretion (People v. Chandler, 88 Ill. App. 3d 644, 650 (1980)), and a trial court's determination regarding whether a juror's assent to the verdict was voluntary will not be set aside unless the determination is clearly unreasonable (Kliner, 185 Ill. 2d at 167).

For the issues at hand, we believe that any findings of fact made by the trial court relating to the sequence of events surrounding the discharge of the verdict and the defendant's request to poll,

such as the amount of time that elapsed, should be accepted unless they are against the manifest weight of the evidence. See Best v. Best, 223 Ill. 2d 342, 350-51 (2006) (trial court's factual findings generally reviewed under manifest-weight-of-the-evidence standard). Determinations of whether that amount of time was sufficient to request to poll the jury and whether the defendant made the request in a timely manner cannot be prescribed within fixed parameters but, instead, are subject to some latitude. We therefore believe that they should be left to the discretion of the trial court, which was in control of the jury and in the best position to determine the answers to these questions in light of the proceedings. See In re Marriage of Rife, 376 Ill. App. 3d 1050, 1058-59 (2007) (reviewing courts defer to trial court decisions that are within the trial court's special competence, in recognition of the trial court's "superior vantage point" on these decisions).

Defendant argues that the Seventh Circuit dealt with a situation identical to his in United States v. Randle, 966 F.2d 1209 (7th Cir. 1992). There, after the trial court read the verdict, it waited only 1½ seconds before beginning to read the defendant's probation report in the jury's presence. Randle, 966 F.2d at 1214. The trial court found that the pause was sufficient to allow the defendant to request a poll, but the Seventh Circuit disagreed, stating that "even the fastest thinking attorney could not have anticipated that the judge had concluded his remarks and was waiting for a request to poll." Randle, 966 F.2d at 1214. The Seventh Circuit noted that within 12 seconds, when defense counsel realized what the trial court was reading, he tried to get the trial court's attention, but it was too late because the jury had already heard prejudicial information about the defendant's arrest record. Randle, 966 F.2d at 1214. The Seventh Circuit labeled the 1½-second interval "clearly *** inadequate" and reversed and remanded for a new trial. Randle, 966 F.2d at 1214. In doing so, it reiterated that, after the verdict has been read, a trial court is required to give both parties a

reasonable opportunity to ask to poll the jury. It recommended that, "[b]ecause what is a reasonable time is fact specific and defies precise parameters, the better practice is for the district court to inquire of both counsel if either has anything further before the jury is discharged, which, of course, invites the request to poll." Randle, 966 F.2d at 1214.

The State argues that Randle is distinguishable because here the trial court actually waited 16 seconds between the time it began reading the verdict and the time it discharged the jury. The State further argues that, when defense counsel said the word "Judge" six seconds later, nothing suggested that he was asking the trial court to poll the jury. Instead, he waited another minute and 14 seconds before he spoke again and asked that the jury be polled.

The State's argument is not persuasive. A defendant exercising his right to poll the jury is not a quiz show contestant who must anticipatorily press the buzzer before the host is finished asking the question or risk losing points. That is, a defendant is not required to impede on the trial's decorum by interrupting the trial court's reading of the verdict in order to preserve his request to poll. See also United States v. Marr, 428 F.2d 614, 615 (7th Cir. 1970) ("the right to poll a jury cannot be exercised intelligently until after the verdict has been announced"). We recognize that we are not required to follow decisions of the federal courts, other than the United States Supreme Court. People v. Calvert, 326 Ill. App. 3d 414, 424 (2001). Still, such decisions can serve as persuasive authority and provide guidance. People v. Criss, 307 Ill. App. 3d 888, 900 (1999). We agree with defendant that, as in Randle, the relevant time period in determining whether there was a sufficient opportunity to request a poll is the time between when the trial court finishes reading the verdict and when it discharges the jury. Randle, 966 F.2d at 1214.

The trial court implicitly recognized the relevant time period when it stated that it looked at defense counsel for "a moment" before discharging the jury. We agree with defendant that the record reveals that the relevant time period was about two seconds. This interval is almost indistinguishable from the 1½ seconds at issue in Randle, and we agree with the Randle court's reasoning that such a short interval of time does not provide a defendant with a reasonable opportunity to request a jury poll. See also United States v. Marinari, 32 F.3d 1209, 1214 (7th Cir. 1994) (pause of " 'several seconds' " between the trial court's reading of the verdict and its remarks to the jury was an insufficient amount of time to allow the defendant to move to poll the jury).

Moreover, the record shows that defense counsel attempted to request a jury poll at what could fairly be characterized as the first available occasion. Although defense counsel interjected "Judge" six seconds after the trial court discharged the jury, it was while the trial court was still addressing the jury and presumably when defense counsel began to realize what was happening. The trial court did not allow defense counsel to speak at that moment. Even if we accepted the State's argument that the interjection was not sufficiently descriptive to show that defense counsel was trying to request a jury poll, defendant made a formal request to poll the jury when the trial court paused in its remarks to the jury, at the first reasonable opportunity. See Marinari, 32 F.3d at 1215 ("counsel's decision not to interrupt the court when it was speaking is not to be held against him").

The trial court denied the motion to poll, stating that it had already discharged the jury, yet it then continued to address the jury for almost another minute. This raises the question of whether the trial court could have, and should have, polled the jury at the time of defendant's request, the discharge notwithstanding. We find guidance on this issue in People v. McNeely, 216 Ill. App. 3d 647 (1991). There, the trial judge read two verdict forms of not guilty and then, not realizing that

two guilty verdict forms remained, stated," 'And now you know why we can't do much with narcotics, and you're excused. Thank you very much.' " McNeely, 216 Ill. App. 3d at 649. There was evidence that the trial judge sounded angry when he made these comments and that he subsequently threw down the verdict forms and ran into his chambers. McNeely, 216 Ill. App. 3d at 650. The jurors started talking amongst themselves and went into the jury room. The judge was quickly informed that he had neglected to read the remaining forms, and he returned to the bench after one or two minutes and asked the jury to return to the jury box. McNeely, 216 Ill. App. 3d at 649-50. The judge then read the guilty verdicts and polled the jury, which affirmed the verdicts. McNeely, 216 Ill. App. 3d at 649.

On appeal, the defendant argued that it was reversible error to receive the guilty verdicts after the jury had been discharged. The appellate court stated that the "pivotal question" was whether the trial court had lost control of the jury, i.e., "whether the protective shield which must surround a jury [had been] removed, allowing the jurors to be influenced by improper outside factors." McNeely, 216 Ill. App. 3d at 652. Although there was testimony that jurors may have heard the defendant talk to his girlfriend after hearing the initial verdicts of not guilty, and that one or two jurors may have gone to the back gate, the appellate court stated that the majority of the evidence showed that the jurors just went back to the jury room by themselves and returned to the jury box when recalled by the judge. The appellate court held that under these circumstances the trial court could have properly concluded that the jury was not subjected to any improper outside influences and could have properly received its verdicts. McNeely, 216 Ill. App. 3d at 652.

In the instant case, there was even less of a threat of outside influences than in McNeely. The record clearly shows that, although the trial court stated that it was discharging the jury, it continued

to address the jurors at length. Even after the trial court denied defendant's motion to poll, it again continued to address the jury for almost another minute. As the jurors still remained seated in the jury box when defendant made his motion to poll and had not been told any prejudicial information by the trial court or other parties, there is no question that the jurors were not subject to influence from any improper outside factors.

We note that our supreme court stated over 100 years ago that "[a]fter the verdict is received, and the jury discharged, the control of the jury over the case is at an end; they can not be recalled to alter or amend the verdict." Bond v. Wood, 69 Ill. 282, 284 (1873). This general statement equates the discharge of the jury with a loss of control over the jury, which is often the case. However, McNeely teaches us that, in situations where the jury remains within the trial court's control, the jury can be recalled to alter or amend the verdict. The appellate court has stated that the "governing legal principle is that once a verdict has been rendered, accepted by the court, and judgment entered thereon, and the jury has separated, the court has lost control of the verdict, and the only remedies are either a mistrial or some variety of post-trial relief." (Emphasis added.) People v. Crite, 261 Ill. App. 3d 1041, 1047 (1994). It follows that, where the jury has not separated, the trial court is still in control of the verdict.

Another Seventh Circuit case provides us with a factual situation analogous to the instant case. In Marinari, after the trial court read the verdict, it paused for only a few seconds before making concluding remarks to the jury. Marinari, 32 F.3d at 1214. The defendant requested to poll the jury after the trial court had excused the jury and the jurors had retired to the jury room. The trial court denied the motion. Marinari, 32 F.3d at 1212. The Seventh Circuit held that the pause before the trial court's concluding remarks was insufficient to allow the defendant to request a jury poll.

Marinari, 32 F.3d at 1214. It also held that the defendant's eventual request to poll was timely because the jurors were still under the trial court's control, in that they had not dispersed and were not tainted by any outside influences. Marinari, 32 F.3d at 1215. It concluded that, because the defendant had an absolute right to poll the jury at the time of his request, the trial court erred by not recalling the jury and conducting a poll. The Seventh Circuit therefore reversed the defendant's conviction and remanded the case for a new trial. Marinari, 32 F.3d at 1215.

Here, like in Marinari, the trial court did not provide enough time between reading the verdict and stating that it was discharging the jury to reasonably allow defendant to make a motion to poll the jury. Furthermore, just as in Marinari, notwithstanding this insufficient pause, defendant made the motion to poll while the jury was still available to be polled. As discussed, there is no question that the jurors had not been subjected to influence from any improper outside factors when defendant made the request. The motion was therefore timely, and the trial court abused its discretion by ruling otherwise. As mentioned, if the jury is not polled in spite of a defendant's timely request to do so, reversible error occurs. DeStefano, 64 Ill. App. 2d at 408-09. Accordingly, we reverse defendant's conviction and remand the case for a new trial.

Because defendant will be receiving a new trial, we only briefly discuss defendant's remaining arguments that the trial court erred by responding to the jury's request to define "reasonable doubt" and that defendant is entitled to a credit of $1,430 against his fines. Regarding the former argument, the trial judge who presided over defendant's case has since retired, so the issue is unlikely to reoccur on remand. On this subject, we simply restate our supreme court's admonition that the "law in Illinois is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." People v. Speight, 153 Ill. 2d 365, 374 (1992). Regarding

sentencing credits, the State agrees that under section 110--14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110--14 (West 2006)) defendant is entitled to $1,430 in credit against the fines imposed as part of his sentence, for the 286 days he spent in custody between the date of his arrest and the date of sentencing. This issue will become relevant on remand only if defendant is again found guilty and ordered to pay fines.

### III. CONCLUSION

For the foregoing reasons, we affirm the Stephenson County circuit court's ruling denying defendant's motion to quash the search warrant and suppress evidence. However, we reverse defendant's conviction and remand the case for a new trial. In doing so, we reiterate that the trial court must give defendant a reasonable opportunity to ask to poll the jury. We also echo the Randle court's advice that, because what constitutes a "reasonable" time varies according to the facts of the case and is not quantifiable within fixed parameters, the better practice is for the trial court to invite a request to poll by asking the parties if they have anything further before it discharges the jury. Finally, the trial court should keep in mind that, even after it has told the jury that it is discharged, the jury is still subject to being recalled and polled as long as it remains within the trial court's control.         Affirmed in part and reversed in part; cause remanded.

GROMETER and CALLUM, JJ., concur.